## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF NEW MEXICO

| | |
|---|---|
| **WILLIAM F. WOLDMAN**, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **KINDER MORGAN, INC**. and | ) |
| **KINDER MORGAN KEYSTONE** | ) |
| **GAS STORAGE, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

## CLASS ACTION COMPLAINT

NOW COMES Plaintiff, William F. Woldman, by and through his undersigned attorneys, on his own behalf and on behalf of all others similarly situated, brings this Class Action Complaint (the "Complaint" or the "Class Action") against Kinder Morgan, Inc. and Kinder Morgan Keystone Gas Storage, LLC and states, upon information and belief including the investigation of counsel, except for Plaintiff's own acts that are based on personal knowledge, as follows:

## SUMMARY OF THE COMPLAINT

1.      This is a class action lawsuit on behalf of natural gas consumers against Kinder Morgan, Inc**.** (hereafter "Kinder Morgan" or "KMI"), one of the largest energy transportation companies in North America, and its affiliate Kinder Morgan Keystone Gas Storage, LLC (hereafter "Keystone" or "KGS"). Keystone owns a natural gas storage facility, which New Mexico Gas Company (NMGC) leases out for the benefit of its customers.

2.      At the Keystone facility, large volumes of natural gas are stored in bedded salt caverns, where the gas can be injected and then subsequently withdrawn when needed.  For years,

New Mexicans, who are NMGC's customers, have benefitted from this storage system.   NMGC generally follows the pattern of buying gas on warmer days at low cost and injecting it into storage.

3.      When cold weather hits, NMGC then withdraws its previously purchased low-cost gas from storage, normally providing customers with a reliable and low-cost source of gas. Although NMGC retains ownership of the gas when it is stored at the Keystone facility, Kinder Morgan controls access to it, which turned out to be a critical point of failure at the heart of this Complaint.

4.      Kinder Morgan could not be trusted with control over the natural gas stored at Keystone.   In the weeks before Winter Storm Uri struck in February 2021, Kinder Morgan effectively heisted New Mexico's natural gas by cutting into NMGC's storage inventory to profit itself and other gas traders and marketers.  The victims were everyday New Mexicans.

5.      Plaintiff brings this Class Action on behalf of himself and all other residential and business customers of NMGC alleging violations of the New Mexico Unfair Trade Practices Act, tortious acts under New Mexico common law and unjust enrichment, arising from Defendants' egregious conduct in anticipation of and during Winter Storm Uri in February 2021.

6.      New Mexico Gas Company, not a party to this Class Action, is the state's largest gas utility, serving over 545,000 customers throughout New Mexico.  Approximately 99% of NMGC's customer base is made up of residential and small business customers that rely on NMGC to provide essential natural gas to heat their homes and businesses.

7.      For many years, including 2021, NMGC leased from Keystone 2.7Bcf (billion cubic feet) of natural gas storage capacity in bedded salt caverns on the Texas side of the Permian Basin, just across the border with New Mexico.  To put this volume in perspective, 1.0 Bcf of

natural gas would supply approximately 17,000 homes for a year, based on the average household natural gas consumption in 2020, according to the U.S. Energy Information Administration.

8.    Defendant Keystone owns this gas storage facility.    Keystone is a wholly owned subsidiary of Kinder Morgan, Inc. Each year, NMGC pays a multimillion-dollar fee to Keystone for this gas storage.    In turn, residential and business customers foot the bill, fully reimbursing NMGC for the lease payments to Keystone, as part of their monthly gas bills.

9.    Before and during Winter Storm Uri, Keystone and Kinder Morgan unlawfully removed and otherwise withheld billions of cubic feet of gas, including NMGC's gas, from access. During the storm, the Class was deprived of a vast inventory of low-cost gas that NMGC and its customers had already paid for.    Consequently, NMGC was forced to purchase replacement gas at record-high prices on the intraday and day-ahead markets.

10.    Over the six-day brunt of Uri, NMGC paid over $100 million for desperately needed gas supply, roughly equivalent to NMGC's total cost of gas in 2020.

11.    Ultimately, residential and business customers fully reimbursed NMGC for the extraordinary gas costs and other related expenses incurred during Winter Storm Uri. These costs arose largely because of Defendants' unlawful conduct, making Defendants liable for a substantial portion of the losses that resulted from the deception and other wrongful acts alleged.

## THE PARTIES

12.    Plaintiff William F. Woldman is resident of Corrales, New Mexico.    During the relevant period, Plaintiff was a customer of New Mexico Gas Company.

13.    Defendant Kinder Morgan Inc. is a Delaware corporation with its principal place of business in Houston, Texas, and with extensive operations throughout New Mexico.    KMI is

publicly traded and has been listed on the S&P 500 since 1997. KMI has approximately $65 billion in market capitalization as of January 2025.

14.    Kinder Morgan, Inc. is listed as manager of Kinder Morgan GP, LLC, a Delaware limited liability company registered to do business in New Mexico.

15.    Defendant Kinder Morgan Keystone Gas Storage LLC is a Delaware limited liability company that owns and operates the Kinder Morgan Keystone Gas Storage facility in Winkler County, Texas. KGS is a wholly owned subsidiary of KMI. Because KMI's employees, working for its Western Pipelines division, control day-to-day decision making over Keystone, Keystone's principal place of business is Colorado Springs, Colorado.

## JURISDICTION AND VENUE

16.    The Court has original jurisdiction over this Class Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because this is a class action in which: (1) there are more than one hundred (100) members in the proposed class; (2) various members of the proposed class are citizens of states different from where Defendants are citizens; and (3) the amount in controversy, exclusive of interest and costs, exceeds $5,000,000 in the aggregate.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in the District, including (1) the fact that business and residential customers of NMGC were saddled with the obligation to reimburse NMGC for the extraordinary costs resulting from Defendants' conduct alleged in this Complaint within the District (2) that these members of the Class used the costly gas within the boundaries of the District (3) that Defendants Kinder Morgan and Keystone disseminated materially false, misleading and otherwise deceptive information to NMGC's gas supply team, who work in the District for a public utility headquartered there (4) that NMGC ranked as Keystone's largest firm

storage customer during the relevant time and (5) much of the gas that NMGC and other Keystone customers inject into Keystone's storage facility originates from the New Mexico sides of the Permian Basin and San Juan Basin.

18.    This Court has personal jurisdiction because Defendants have sufficient minimum contacts with New Mexico so as to render the exercise of jurisdiction by the New Mexico courts permissible under traditional notions of fair play and substantial justice.  As alleged throughout this Complaint, Defendants contacts with New Mexico are extensive.

## GENERAL ALLEGATIONS

### New Mexico Gas Uses Keystone as Part of its Standard Operations

19.    As a bedded salt storage facility, Keystone advertises itself as "high deliverability" gas storage, which means firm storage customers like NMGC should be able to inject or withdraw gas on short notice, moving the gas through the large pipelines connected to the facility.

20.    Salt is impermeable to natural gas, and the ability to inject and withdraw gas quickly makes salt caverns ideal for meeting short-term demand surges, such as those NMGC faces during the winter heating season.  Just as individuals renting a storage unit retain ownership of their stored belongings, NMGC retains full ownership, or title, to the gas it injects into Keystone's salt caverns, even though Keystone physically holds the gas and controls access to the facility.

21.    The Keystone storage facility connects to three interstate pipelines: the Northern Natural Gas Pipeline, the Transwestern Pipeline (TW) and the El Paso Natural Gas Pipeline (EPNG), which is, like Keystone, a wholly owned subsidiary of KMI.  NMGC delivers gas for injection to Keystone, and receives gas from withdrawals, through EPNG and TW.

22.    For years, NMGC has been Keystone's largest firm storage customer. Unlike interruptible storage, which can be limited during peak demand, firm storage ensures NMGC has

priority access to its stored gas whenever needed.  Keystone plays a critical role in NMGC's annual gas supply strategy, enabling the company to purchase and store gas at lower prices during the lower demand "shoulder months" of September, October, and November.  NMGC then withdraws the bulk of this stored gas in the winter heating season, when market prices and customer demand are at their highest.

### The Storm Approaches

23.    When Winter Storm Uri struck in February 2021, Keystone reneged on the guarantees inherent in firm storage contracts, severely limiting NMGC's withdrawal of *its own gas* in storage and ultimately depriving NMGC of a substantial portion of the gas it had priority rights to withdraw.  Although NMGC was able to buy replacement gas during the storm in the intraday and day-ahead markets, thus avoiding devastating and potentially deadly gas outages for its customers, the replacement gas came at an enormous cost.

24.    Under NMGC's contract with Keystone, its daily withdrawal rights fluctuate based on its total stored inventory.  To ensure it can withdraw gas when cold weather inevitably arrives, NMGC injects gas on warmer days to maintain sufficient inventory at Keystone. As a result, NMGC maintained a substantial natural gas inventory at Keystone ahead of the storm.

25.    On February 8, 2021, NMGC's gas supply team began tracking weather forecasts predicting an imminent winter storm. As planned, NMGC had ample inventory in storage and intended to withdraw the maximum contractual limit of 165,000 MMBtu (million British thermal units) per day from Keystone during the anticipated storm.  For perspective, 1.0 Bcf is roughly equivalent to 1,000,000 MMbtu.

26.    On February 12, 2021, the NMGC gas supply team held its regular morning meeting at 6:10 a.m., described in testimony and exhibits before New Mexico regulators.  "We

[the gas supply team] planned to withdraw a lot of our gas from KM storage." Also, "We planned to use a lot of our storage, which we had 165k MMBtu of withdrawal rights to. . . . At this point we had no indication from our counterparty that getting our gas from storage would be an issue and we planned to rely on it heavily."[1] The terms "KM storage" and the "counterparty" refer to Kinder Morgan's Keystone facility.

27.      At about 4:30 p.m. on the next day, Saturday, February 13, when the storm was moving into New Mexico, the NMGC gas supply team called Keystone's representative "to ensure that we would be able to withdraw the maximum amount [they] were entitled to over the weekend"[2].

28.      Keystone's representative continued to reassure the gas supply team on the Saturday phone call: "We were planning to rely heavily on our storage supply so we wanted to confirm things with them. The KM Storage representative agreed that our withdrawal volumes were fine." [3]

29.      However, the next morning on February 14, the situation rapidly deteriorated when Keystone failed to deliver NMGC's gas to the TW pipeline, without explanation. "We [the NMGC gas supply team] needed to know why KM Storage was not delivering all of our gas, so we tried calling the KM Storage representative to find out what was going on. The KM Storage representative responded by text saying that she was in a meeting. Since we couldn't reach anyone from KM Storage, Josh Tilbury [NMGC's Director of Gas Management] called the El Paso Natural Gas Pipeline representative (another Kinder Morgan company) and asked for the phone number

---

[1] Ex. 1 (not attached to this Complaint), NMGC's Application for Expedited Approval of its Plan for Recovery of 2021 Winter Weather Event Gas Costs, filed on April 16, 2021, before the New Mexico Public Regulation Commission (NMPRC), NMPRC Case No. 21-00095-UT.
[2] Ex. 1, NMGC's Application, NMPRC Case No. 21-00095-UT.
[3] Ex. 1, NMGC's Application, NMPRC Case No. 21-00095-UT.

of the EP Pipeline vice president of the southwest area in an effort to escalate the matter. The EP Pipeline representative would not provide the phone number." [4]

30.    Although Keystone's storage representative finally called back later in the morning on February 14, what she said could not be reconciled with reality.  "KM Storage said they were going to be able to deliver all of our gas." [5]  Yet, from that morning through the rest of the storm, Keystone failed to deliver a substantial portion of the gas NMGC owned in storage and possessed priority rights to withdraw.

### The Aftermath Following Uri

31.    Before the storm, NMGC had paid between $3.00 and $4.00 per MMbtu for the gas it had stored with Keystone.  While they were denied access to their stored gas during the storm, NMGC paid between $100.00 and $252 per MMbtu for intraday gas and nearly $120.00 per MMbtu for day-ahead gas.  By the time the storm abated, and the markets settled down, NMGC had incurred over $100 million in extraordinary additional gas costs over the six days of Winter Storm Uri, roughly equivalent to NMGC's total cost of gas in 2020.  Keystone's unjustified failure to deliver NMGC's stored gas, or its outright refusal to do so, is responsible for the lion's share of these extraordinary costs

32.    The gas was so costly during the storm that NMGC exceeded the credit limits it had with gas suppliers, who fortunately continued to supply gas despite the exceeded limits.  Still, NMGC ultimately had to take out a bank loan for over $100 million to cover the costs.  Normally, NMGC recovers the cost of gas from its customers monthly under a cost recovery mechanism called the Purchased Gas Adjustment Clause (PGAC).  Under New Mexico law, fuel costs, such

---

[4] Ex. 1, NMGC's Application, NMPRC Case No. 21-00095-UT.
[5] Ex. 1, NMGC's Application, NMPRC Case No. 21-00095-UT.

as gas supply costs recovered through a PGAC, are pass-through costs with no markup or markdown by NMGC.

33.     To prevent a massive price spike from appearing on a single monthly bill, NMGC sought to ease the looming financial crisis for its customers under the PGAC.  NMGC requested and received approval from New Mexico regulators[6] to recover more than $100 million in extraordinary gas costs, plus interest on the bank loan, over a 30-month period.  Although the storm had passed, the financial nightmare for NMGC's customers was only beginning.  By the end of the repayment period, NMGC had fully recovered the extraordinary costs it incurred during Winter Storm Uri from its residential and business customers.

**The Coverup Begins**

34.     Months after the fact, Kinder Morgan's lawyers tried to manufacture excuses and blame "extreme cold" for Keystone's abject failure to deliver NMGC's gas during the storm.  At the behest of New Mexico regulators in NMPRC Case No. 21-00095-UT, NMGC's general counsel asked Keystone to justify its failure to deliver.  NMGC received a response from Tony Sala, KMI's managing counsel, in a letter dated April 30, 2021 (the "April 30 Letter").[7]  Mr. Sala is now a vice president of KMI.

35.     In the April 30 Letter, KMI blames "freezing temperatures" for Keystone's failures during the "Cold Weather Event."  The letter also cites "low cavern pressure" as a contributing factor, without explaining how cold surface temperature would cause low cavern pressure. Blaming the cold does not hold up as an explanation of what happened to NMGC's stored gas

---

[6] *See generally* docket in NMPRC Case No. 21-00095-UT.
[7] Letter to Thomas M. Domme, NMGC, Vice President & General Counsel, from Tony Sala, Kinder Morgan's Managing Counsel dated April 30, 2021.

during Winter Storm Uri. Gas in salt storage is warm, dry, and stored in a stable environment. Cold weather on the surface does not cause low cavern pressure.

36.    Depending on the depth of the caverns in layered salt beds, the temperature of natural gas stored in salt can range between 75°F and 200°F. This geological feature ensures that the storage temperature remains stable and essentially unaffected by ambient surface conditions.

37.    Gas stored in salt caverns is also dry before entering interstate pipelines to meet strict transport quality standards. Thus, the gas is dry when injected and when withdrawn, because the three interstate pipelines are the only paths in and out of facility. In fact, Keystone's Operating Statement, the main contract document between KGS and its customers, *requires* dry gas: "The natural gas shall be free of water and hydrocarbons in liquid form at the temperature and pressure at which the Gas is Delivered."[8]

38.    Simply put, dry gas in storage has nothing in it that can freeze in the "freezing temperatures" cited in the letter and comes out of storage warm. The physical characteristics of bedded salt storage make KGS's advertising of "high deliverability" something commercially reasonable to believe in and material to NMGC.

39.    Moreover, storing gas for withdrawal in cold weather is the primary purpose behind NMGC's lease of storage capacity at Keystone, which Keystone frustrated during Winter Storm Uri. Because planning for cold weather is the primary purpose of the agreement between Keystone and NMGC, "freezing temperatures" naturally never came up in repeated communications between the two companies in the lead-up and during Winter Storm Uri.

---

[8] Section 15, Operating Statement for Kinder Morgan Gas Storage, Version 7.0.

40.     To the contrary, as alleged previously, Keystone's representatives repeatedly reassured the gas supply team that NMGC would be able to withdraw gas to the full extent of its firm contract, separately on February 12, February 13 and finally on February 14, 2021.

41.     Kinder Morgan and KGS belatedly blamed the cold weather to hide the real reason for the failure to deliver NMGC's gas: a risky change in the business operations of Keystone literally at the expense of firm storage customers like NMGC and in favor of interruptible customers, who are mostly gas traders and marketers.

**Why the Coverup: KMI's Move of Keystone from Sleepy Gas Storage to Profit Center**

42.     Kinder Morgan acquired the Keystone storage facility from Chevron in 2014, changing its name from Chevron Keystone Gas Storage, LLC to Kinder Morgan Keystone Gas Storage, LLC.   KMI operates Keystone as part of its Western Pipelines division headquartered at 2 North Nevada Avenue, Colorado Springs, CO 80903.

43.     When Kinder Morgan bought the Keystone storage facility from Chevron, it was a steady but low-growth business, mostly providing firm storage to utility customers, who aim for reliability and stability of gas supply.  In the quarter ending June 30, 2014, before Kinder Morgan took over Keystone, Chevron had only two small interruptible contracts and leased most of the facility's capacity in nine firm contracts, which included contracts with NMGC; Arizona Electric Power Cooperative, Inc., Salt River Project Agricultural Improvement and Power District, El Paso Electric Company (not to be confused with EPNG),  and Arizona Public Service Company.

44.     Moving forward to 2021, Keystone's firm storage business remained largely the same, including Chevron's customers like New Mexico Gas Company, El Paso Electric Company and Salt River Project Agricultural Improvement and Power District.  NMGC was Chevron's

largest customer, leasing 2.7 Bcf in firm storage capacity at the Keystone facility in 2014, and remained Kinder Morgan's largest, leasing 2.7 Bcf in storage capacity in 2021.

45.    The big change under Kinder Morgan was explosive growth in KGS's interruptible storage business.  When it bought Keystone, Kinder Morgan layered on dozens of "park and loan" (PAL) contracts aimed at gas traders and marketers.  By the time Winter Storm Uri hit in 2021, Keystone had over 90 distinct interruptible contracts with customers like Eco-Energy Natural Gas, LLC, a gas trading subsidiary of Brazilian commodities giant Copersucar.

46.    Traders and marketers find Keystone attractive, in part because it sits in a regulatory blind spot.  As an intrastate storage asset, Keystone is not subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC) under the so-called Hinshaw Amendment, § 1(c) of the Natural Gas Act (NGA), 15 U.S.C. § 717(c).   Section 1(c) of the NGA provides that intrastate rates and services are exempt from FERC scrutiny.  Likewise, the Texas Railroad Commission has chosen not to regulate Keystone.

47.    With interruptible PAL storage, traders and marketers hope to achieve price arbitrage, betting on the price differentials between time periods.  Traders want to park gas during periods with low prices and borrow gas and sell it on, when prices go high.   These traders and marketers have no businesses or residences as end-use customers and thus no service obligations, as would a public utility.  Their focus is on price movements and profit-at-any-cost, not reliability and stability of gas supply.

48.    PAL contracts are lucrative for Keystone because the arrangement allows rapid cycling of gas through the facility with loans, triggering more fees, and the fees themselves are heftier.  Because they are interruptible, PAL customers should never take priority over a firm storage customer like NMGC.  Yet, in the lead-up to Winter Storm Uri, Kinder Morgan and

Keystone gave interruptible customers priority, when they lent out too much gas before Winter Storm Uri hit and cut into inventory belonging to NMGC. Beyond that, the massive outflows of gas before the storm crippled the facility's functionality by significantly reducing cavern volumes and pressures.

49.     The change in customer bases, from the firm storage dominated Chevron model to Kinder Morgan's trader dominated model, was KMI's business decision motivated by the higher profits to be had with PAL contracts.

50.     Pipeline data indicate that approximately 2,000,000 MMbtu net flowed out of Keystone, withdrawals net of injections, in the weeks leading up to February 12, 2021, the day before Winter Storm Uri began. Critically, approximately 500,000 MMbtu of that net outflow happened between February 1 and February 12, in clear anticipation of the storm and the price surges usually associated with cold weather events. Available information indicates this huge net outflow was mostly attributable to Keystone's PAL customers.

51.     Keystone allowed gas traders, marketers and others to borrow or otherwise take delivery of gas under interruptible contracts before the storm. This net outflow was not returned to the facility until after the storm ended, by which time the damage was done. In effect, Keystone stole NMGC's gas in its time of need for the sake of quick fees and additional profits.

52.     The roughly 2,000,000 MMbtu net outflow from Keystone in the weeks before Winter Storm Uri, if it had been left in storage as it should have been, would have covered NMGC's priority right to withdraw 165,000 MMbtu per day from KGS during the entire storm. Instead, Keystone gave priority, at a premium fee for itself, to its interruptible customers over NMGC.

53.     To put these net outflow volumes in economic perspective: NMGC was forced to pay up to $252 per MMBtu for replacement gas during Winter Storm Uri. At that price, the gas that Keystone absconded with and loaned away was worth over $500 million.  Given that prices in Texas reached upwards of $400 per MMBtu during Uri, the market value would be closer to $800 million, if it was sold into the Texas intrastate market during the storm.

54.    The price differential between gas sold on the Texas intrastate market during Winter Storm Uri and the gas NMGC purchased in the intraday and day-ahead markets is a key aspect of the misconduct alleged in this Complaint.  Despite paying record-breaking prices during the storm, NMGC still paid less than Kinder Morgan and other traders and marketers received on the Texas intrastate market. This differential was partly due to NMGC's proximity to the San Juan Basin, which was less affected by Uri.  Given Kinder Morgan's wrongful conduct, it would be unjust for Kinder Morgan to benefit from this differential.

55.    Inventory estimates of Keystone's total working gas support the inference that Keystone engaged in unauthorized withdrawals from firm storage, cutting into NMGC's inventory before the storm. Working gas refers to the volume of natural gas in storage that is available for withdrawal. It excludes base gas (also called cushion gas), which must remain in storage to maintain the facility's functional integrity.  In bedded salt storage, base gas primarily maintains sufficient pressure to support injection and withdrawal rates.

56.    KGS advertises that it "has seven bedded salt caverns, contains approximately 8.5 Bcf of total gas storage capacity and has a working natural gas storage capacity of approximately 6.38 Bcf."  The difference between total and working capacity is the required base gas.  Recall that 1.0 Bcf is roughly equivalent to 1,000,000 MMbtu.

57.    According to pipeline data and other available information, KGS had approximately 5.8 Bcf working gas in storage at the beginning of December 2021, which means Keystone was at approximately 90% of capacity weeks before the storm.  On or about February 12 to February 13, at the start of the storm, Keystone's working gas in storage had dropped to approximately 3.8 Bcf or 60% of capacity, and then it quickly fell to approximately 50% of capacity on or about February 14.

58.    By allowing working gas in storage to fall so steeply, Keystone not only cut into NMGC's inventory but also partially depressurized the facility.  Pressure of natural gas stored in a salt cavern is directly tied to the amount of gas present. With net outflow, remaining gas expands to fill the cavern, resulting in lower pressure.

59.    This significant drop in pressure, not "freezing temperatures", was the direct and proximate cause of any physical problems Keystone experienced delivering gas to NMGC during Winter Storm Uri.  The massive net outflow from the Keystone facility, which Kinder Morgan orchestrated and encouraged with its shift in business focus to PAL contracts with traders and marketers, created the operating conditions for the pressure drop.

60.    On February 14, 2021, despite having assured NMGC's gas supply team earlier in the morning that Keystone would "deliver all of [NMGC's] gas," KGS posted the first notice claiming force majeure on its electronic bulletin board at 12:40 p.m. ("FM Notice #1").  A valid force majeure event can excuse one or both parties to a contract from performance when circumstances beyond their control, such as natural disasters, war, pandemics, or government actions, prevent or delay performance.  In civil litigation, force majeure is an affirmative defense to a claim for breach of contract.

61.    Keystone's FM Notice #1 cited "low field pressure" and "mechanical failure" for the decision to limit withdrawals from the facility, with absolutely no mention of cold temperatures or further details whatsoever.  Low field or cavern pressure, particularly resulting from Keystone's prioritizing interruptible activity, is not an event of force majeure under Keystone's contract with customers.[9]  Because cavern pressure is in the control of a storage operator, it does not fit the definition of force majeure as generally understood.  When taken in the context of the large net outflow of gas before the storm, FM Notice #1 is a tacit admission that Kinder Morgan and Keystone caused the low cavern pressure and any physical problems with delivery of NMGC's gas.  Reinforcing the admission, FM Notice #1 does not claim that mechanical failure was caused by something outside of Keystone's control.

62.    KGS posted an updated notice of force majeure at 8:43am on February 15 (FM Notice #2).  Keystone's FM Notice #2 continued to cite "low field pressure" and "mechanical failure" for the decision to limit withdrawals from the facility but again does not mention cold temperatures.  When taken in the context of the large net outflow of gas before the storm, FM Notice #2 is another tacit admission that Kinder Morgan and Keystone caused the low cavern pressure and any appurtenant physical problems with delivery of NMGC's gas.  Again, there is no assertion that mechanical failure was caused by something outside of Keystone's control.

63.    Hours after FM Notice #2, KGS posted a notice cancellation of force majeure at 4:35 p.m. on February 15 (FM Cancellation).  Keystone's FM Cancellation is internally inconsistent, purportedly cancelling force majeure on the one hand but inexplicably continuing to limit withdrawals with the other.

---

[9] Section 11, Operating Statement for Kinder Morgan Gas Storage, Version 7.0.

64.    Keystone's FM Cancellation states that limits will continue to be imposed "[g]iven sustained withdrawals of the last several days and resulting low cavern pressure".  While this statement indirectly acknowledges the truth — that sustained withdrawals resulted in low cavern pressure — it deceptively focuses on the period of the storm only, with the phrase: "the last several days."  In truth, as alleged previously, sustained withdrawals started in the weeks leading up to February 2021, resulting in approximately 2,000,000 MMbtu in net outflow from the facility leading up to Uri.

65.    Because Keystone posted the FM Cancellation days before the facility returned to normal withdrawal rates, it represents a tacit admission that the prior notices do not describe a legitimate assertion of force majeure.  Again, the FM Cancellation does not mention either mechanical failure or cold temperatures, describing only the same (self-inflicted) problems with cavern pressure.

66.    The FM Cancellation confused NMGC's gas supply team.  "That afternoon we received a notice from KM canceling the Force Majeure, however, they indicated that they still were not operating at full capacity and had reduced withdrawal rates. This meant that even though the Force Majeure was no longer in effect, we still were not getting access to all of our supply and again we didn't know how much supply we would be able to get." [10]

67.    By choosing to change Keystone's business model from a focus on firm storage customers to one focused on interruptible traders and marketers with PAL contracts, Kinder Morgan and Keystone took on a duty to replace NMGC's missing gas, which is the difference between what NMGC should have received under its maximum priority withdrawal rate of 165,000 MMBtu per day during the storm minus what it in fact received.

---

[10] Ex. 1, NMGC's Application, NMPRC Case No. 21-00095-UT.

68.    Kinder Morgan's and Keystone's duty to replace NMGC's missing gas also arises from the high risk of injury and death posed by failing to deliver NMGC's gas in extreme weather. Although NMGC was able to source and obtain replacement gas on the intraday and day-ahead markets and received permission to exceed its credit limits from suppliers, thus avoiding curtailments and outages in New Mexico, people in Texas were not so fortunate.

69.    According to the official toll, 246 people died in Texas during Winter Storm Uri. Some of those deaths resulted from gas and power outages.   In turn, power and gas outages are linked because power generators often use natural gas in their peaking facilities.  Injury and death during a period of extreme weather are the foreseeable consequences of depriving a firm storage customer of gas, particularly a customer who is also a public utility.  The deaths in Texas during Winter Storm Uri provide a real-world example of facts giving rise to the duty to provide replacement for NMGC's missing gas.

70.    Also, Kinder Morgan and Keystone voluntarily took on the duty to replace NMGC's missing gas in KGS's PAL arrangements, as the supplier of last resort for the facility. In the event of a failure to redeliver loaned gas, KGS's PAL contract does not require the borrower to redeliver loaned gas physically but instead forces the borrower to purchase gas from KGS as, in effect, the supplier of last resort. [11]

71.    Through its EPNG subsidiary, Kinder Morgan controls a large storage facility in Eddy County, New Mexico, called Washington Ranch. Washington Ranch, at 44 Bcf in working gas storage capacity, dwarfs Keystone's 6.38 Bcf in working gas storage capacity.  Washington Ranch does not offer firm storage services to customers outside of Kinder Morgan, so the working gas in storage there would not have been contractually obligated outside Kinder Morgan during

---

[11] Section 9-Failure to Redeliver Loaned Gas, Operating Statement for Kinder Morgan Gas Storage, Version 7.0.

Winter Storm Uri.  Because of these facts, it would have been reasonable for Keystone and Kinder Morgan to replace NMGC's from Washington Ranch.

72.     In addition to Washington Ranch, Kinder Morgan and Keystone had access to other sources of gas supply, from which it would have been reasonable to replace NMGC's missing gas during Winter Storm Uri.

73.     Kinder Morgan and Keystone intentionally breached the duty to replace NMGC's missing gas during Winter Storm Uri, which forced NMGC to buy replacement gas on the intraday and day-ahead market, thus directly and proximately causing a substantial portion the over $100 million in extraordinary costs borne by NMGC's customers.

74.     While NMGC's residential and business customers suffered an enormous economic loss, KMI posted an unprecedented profit in 2021, a $1.665 billion *increase* in annual earnings for 2021 compared to 2020, and admitted that the profit increase resulted mostly from $1.092 billion in "earnings related to the February 2021 winter storm."[12]

75.     Although interconnecting to three interstate pipelines regulated by FERC, KGS sits in a regulatory blind spot that makes it part of KMI's Texas intrastate gas system, which also includes other storage facilities in Texas.  In KMI's April 21, 2021, earnings guidance, KMI Chief Executive Officer Steve Kean stated: "Our storage assets performed exceptionally well, allowing us to deliver gas into the market throughout the storm. These storage withdrawals, along with gas we purchased before and during the event, enabled us to deliver significant volumes of gas at contractual or prevailing prices."

76.     Similarly, in a May 2021 slide deck, a Kinder Morgan investor presentation described the "valuable" Texas intrastate system, which includes KGS and other storage facilities

---

[12] Kinder Morgan, Inc. SEC Form 10-K Annual Report as of 12/31/2021.

that are "increasingly important." The investor presentation credited a portion of its increased earnings during Winter Storm Uri to the fact that "KMI retains a portion" of its Texas intrastate storage for its own account and "transact[s] at market prices."

77. These admissions support the inference that KMI used a significant portion of the net outflow from Keystone — gas owned by NMGC and other firm customers — for its own account to sell into Texas, where prices reached upwards of $400 per MMBtu during the storm. Certainly, KMI sold gas into Texas, which it could have used to replace NMGC's missing gas, and which, in fact, may have *been sourced from* NMGC's stored gas supply in Keystone.

78. Taken together, these admissions about Kinder Morgan's extraordinary profit support the inference that Kinder Morgan and Keystone intentionally breached their duties to NMGC, including the duty to replace NMGC's missing gas.

79. KMI is directly liable for tortious conduct arising from decisions that could only be made by executives and employees of KMI itself. Furthermore, it was KMI, not Keystone, that was unjustly enriched with extraordinary profits.

80. Keystone has no employees of its own with decision making authority, and KGS acts through employees of its parent KMI or other affiliates. In the lead-up to Winter Storm Uri and during the storm, the NMGC gas management team dealt with, or were asked to deal with, employees of KMI's entire Western Pipelines division, working out of Colorado Springs, Colorado. FM Notice #1, FM Notice #2 and the FM Cancellation were issued under the authority of Richard Aten, Manager of Nominations and Scheduling, Western Pipelines.

81. Reinforcing the inference that KMI manages its pipeline and storage assets in an integrated manner and that Keystone has no operational independence, all injection instructions and withdrawal instructions, as well as pipeline nominations, must proceed through DART (Direct

Access Request Tracking), KMI's electronic information system for KMI's natural gas pipelines and storage facilities to communicate with customers and manage services.   Injection and withdrawal instructions and pipeline nominations are formal requests to inject or withdraw a volume of gas or move a volume of gas through a pipeline.

82.    When KMI shifted Keystone's business toward interruptible PAL contracts, executives and employees at KMI had to be the people charged with making the change, because it necessarily involved multiple Kinder Morgan affiliates and implementation through DART.

83.    Kinder Morgan markets Keystone as an integrated component of KMI's West Region Gas Pipelines, one of several "Kinder Morgan Assets" important to customers. KMI highlights Keystone along with other assets and touts: "Significant storage capacity with superior connectivity."  Keystone is displayed east of KMI's Washington Ranch gas storage facility in Eddy County, New Mexico, which is owned by KMI's affiliate El Paso Natural Gas.



84.    Also, Kinder Morgan and Keystone expect and encourage customers to rely upon Keystone storage as a part of operational response during the winter months.  For example, El Paso Natural Gas Pipeline's Winter Preparedness Plans highlight Keystone as part of "operational

response" in the winter that includes "[a]ccess to supply area storage: Washington Ranch, Keystone Gas Storage and Merchant Ranch Storage."



85.    With available storage and capacity nearby, it was clearly feasible for Kinder Morgan and Keystone to replace NMGC's stolen or misappropriated gas during Winter Storm Uri.

86.    For example, the "EPNG System Overview" highlights the fact that EPNG "owns approximately 44 billion cubic feet of underground working natural gas storage capacity in Southeast New Mexico", which is Washington Ranch shown on the map with a star.  The map also shows flow directions on Kinder Morgan's pipeline system.  Coupled with large working storage capacity at Washington Ranch, pipeline flow directions support the inference that Kinder Morgan shipped natural gas produced and stored in New Mexico and sold it on the Texas intrastate market during Winter Storm Uri.



## EPNG System Overview
Supply Locations and Flow Direction



87.     How then did NMGC find itself at the mercy of KMI and Keystone? In the years leading up to Winter Storm Uri, Kinder Morgan and Keystone developed and maintained a superior bargaining position with New Mexico Gas Company.  Especially after Kinder Morgan acquired EPNG in 2012, it became effectively impossible for NMGC not to deal with Kinder Morgan and its affiliates.  EPNG is a major transporter of natural gas to NMGC, from both the San Juan and Permian basins.

88.     Kinder Morgan is in a superior bargaining position to NMGC partly because KMI's assets are historically and physically intertwined with NMGC's gas supply in the Permian and San Juan Basins, in a way that cannot be disentangled.

89.     Kinder Morgan is also in a superior bargaining position because it is a vastly larger company, with horizontal integration across pipelines, storage, oil and gas production and oil and gas marketing.  KMI has a market capitalization of approximately $65 billion as of January 2025.

90.     Kinder Morgan does not hesitate to use its superior bargaining power.  For example, Keystone refuses to negotiate terms in its operating statement, which is the primary contract

document between KGS and its customers, both firm and interruptible. KGS's operating statement contains all contractual terms of service for the facility—including firm and interruptible storage terms, park and loan terms, and a force majeure provision. The operating statement only excludes price terms (i.e. storage fees), injection and withdrawal rates and storage volumes.

91.    Because it is standardized and unchangeable from NMGC's perspective, the result is a disparity in economic power, standardized and presented to potential customers as take-it-or-leave-it. KGS's operating statement is a commercial contract of adhesion. Notably, KGS's operating statement contains no contractual mechanism for a customer to challenge or question declarations of force majeure or otherwise challenge KGS' unilateral limitations on withdrawals from storage.

92.    In summary, there exists a large disparity in economic power between Kinder Morgan and Keystone on the one hand and New Mexico Gas Company on the other, notwithstanding the fact that NMGC's firm storage agreement arises in the commercial context.

## CLASS ALLEGATIONS

93.    Plaintiff brings this Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and  all others similarly situated, consisting of all customers, both residential and commercial, of NMGC from whom costs were recovered under NMGC's Cost Recovery Plan for Costs Related to the 2021 Winter Event, approved and modified by the NMPRC in its Final Order in Case No. 21-00095-UT entered on June 15, 2021 (the "Class").

94.    This Action is properly maintainable as a class action.

95.    **Numerosity:** The Class is so numerous that joinder of all members is impracticable. The customers of NMGC, who are members of the Class, number approximately 545,000.

96.    **Commonality and Predominance**: As to the Class, this action involves common questions of law and fact, which predominate over any questions affecting individual class members. Such common questions include:

(1) Whether Defendants owed a duty to reasonably maintain and reasonably manage withdrawals, gas loans, and self-interested sales of gas from the Keystone facility;

(2) Whether Defendants breached their duty by failing to maintain and/or test their facilities, failing to maintain cavern pressures, failing to preserve NMGC's owned gas in storage, improperly withdrawing, loaning, or selling NMGC's gas;

(3) Whether Defendants' conduct constituted unfair or deceptive trade practices;

(4) Whether Defendants unjustly abused their superior bargaining position with NMGC to deprive NMGC and the class of reasonable alternatives, negotiated terms, or access to competing facilities to the detriment of NMGC and the Class;

(5) Whether Defendants wrongfully and tortiously interfered with a reasonable prospective economic advantage common to the Class; and

(6) Whether Defendants were unjustly enriched by wrongful, willful, malicious, or reckless conduct; and

(7) Whether the Class of plaintiffs suffered damages proximately caused by Defendants' conduct.

97.    Defendants have acted on grounds generally applicable to the Class with respect to the matters alleged in this Complaint, thereby making appropriate the relief sought in this Complaint with respect to the Class as a whole.

98.    **Typicality:** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.  Plaintiff and Class Members were each unjustly burdened with the extraordinary costs of NMGC's additional gas expenditures resulting from Defendants' wrongful conversion or denial of access to NMGC's gas stores at Keystone.

99.    **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

100.    **Predominance and Superiority:** Plaintiff anticipates that there will be no difficulty in the management of this litigation. Common issues, like those listed above, predominate over individual issues and maintaining this action as a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Also, the damages suffered by Plaintiff  and the Class are relatively small individually compared to the burden and expense required to individually litigate their claims against Defendants.  Thus, individual litigation by class members to challenge Defendants' conduct would be impractical.  Individual litigation would also strain the court system, create potential for inconsistent or contradictory judgments, increase delay and expense to all parties and the courts. Class action litigation, however, presents fewer difficulties and provides benefits of a single adjudication, economies of scale, and uniform, comprehensive supervision by one court.

101.    **Risk of Prosecuting Separate Actions:** This case is appropriate for certification because prosecuting claims separately by individuals would create the risk of inconsistent, varying

or contradictory adjudications, disparate and incompatible standards of conduct for Defendants, or would be dispositive of interests of members of the proposed Class.

102.    **Ascertainability:** The Class is defined by objective criteria, namely residential and commercial customers of New Mexico Gas Company, and there is a feasible mechanism to identify and determine members of the Class.

103.    Plaintiff anticipates that there will be no difficulty in the management of this litigation. Common issues predominate over individual issues and maintaining this action as a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Negligence

104.    Plaintiff realleges and incorporates by reference, as if fully set forth here, allegations contained in the preceding paragraphs of this Complaint.

105.    Defendant KGS had a duty of ordinary care in the operation of the Keystone natural gas storage facility toward NMGC and its customers.

106.    Defendant Kinder Morgan had a duty of ordinary care in the management and operation of its Western Pipeline division toward NMGC and its customers, including duties:

a. not to operate KGS in a manner to reduce cavern pressures below thresholds that would unreasonably restrict Keystone's ability to deliver on contractually prioritized firm contracts.

b. not to loan or otherwise misappropriate or convert NMGC's gas without reasonable ability to return or replenish the loaned or taken gas.

107.    Defendants Kinder Morgan and Keystone both had a duty (1) to operate the Keystone Gas Storage facility in a reasonable manner so as to maintain required cavern pressures

to allow for reasonable and expected delivery in line with NMGC's withdrawal rights; (2) to reasonably maintain their facilities so as to allow for reasonably continuous and regular operations sufficient to support delivery in line with NMGC's withdrawal rights; (3) not to allow interruptible customers or KMI's and/or KGS's related entities withdraw gas belonging to NMGC; and (4) to replace NMGC's missing, improperly withdrawn, or loaned gas, arising from contract and other sources as alleged previously.

108.    Defendants Kinder Morgan and Keystone negligently breached these duties in the lead-up and during Winter Storm Uri by (1) allowing for and/or directing the withdraw of excessive amounts of gas leading up to Uri resulting in low cavern pressures and issues with deliverability; (2) failing to maintain, repair, and/or test their facilities at Keystone Gas Storage; (3) prioritizing interruptible customers or entities closely related to KMI and/or KGS to withdraw gas in amounts that converted NMGC's gas; and/or (4) failing to replenish or replace gas improperly taken or allowed to be withdrawn from KGS.

109.    The foregoing breaches directly and proximately caused damages to Plaintiff and members of the Class by depriving NMGC of its ability to withdraw its gas and resulting in NMGC being forced to purchase gas at outrageous market prices, which costs were then passed on to Plaintiff and members of the Class, as customers of NMGC, in an amount to be proven at trial.

110.    Defendants' conduct toward NMGC and its customers was malicious, willful, reckless, wanton, fraudulent or in bad faith and done with utter indifference to or conscious disregard for the rights and safety of NMGC's customers, entitling Plaintiffs and the Class to punitive damages.  Such malicious, willful, reckless, wanton, fraudulent and/or bad faith conduct includes, but is not limited to, withdrawing NMGC's gas to be provided to interruptible customers or entities closely related to Defendants to be resold for gross and excessive profits despite the

knowledge or intent that such withdrawals would work to preclude NMGC from withdrawing its full allotment. Defendants conduct further evinces a conscious disregard for the rights and safety of others because depriving a public gas utility like NMGC of a portion of its gas supply during a winter storm foreseeably puts its customers at risk of injury and death.

## COUNT II

**For Violations of the New Mexico Unfair Practices Act
(N.M. Stat. Ann. §§ 57-12-1 to 57-12-26)**

111.    Plaintiff realleges and incorporates by reference, as if fully set forth here, allegations contained in the preceding paragraphs of this Complaint.

112.    Plaintiff brings this Second Cause of Action against Defendants Kinder Morgan and Keystone on behalf of himself and on behalf of the Class of customers of NMGC for violations of the New Mexico Unfair Practices Act (UPA).

113.    Plaintiff, Defendants and members of the Class are "persons" under Section 57-12-2(A) of the UPA.

114.    Keystone's provision of natural gas storage services to NMGC constitutes "trade" or "commerce" under Section 57-12-2(C) of the UPA because Defendants advertised, offered and provided services "directly or indirectly affecting the people" of New Mexico including Plaintiff and members of the Class.

115.    Defendants engaged in unfair and deceptive practices under Section 57-12-2(D) of the UPA because they knowingly made false or misleading oral and written statements, visual descriptions or other representations in connection with natural gas storage at Keystone that tended to deceive and mislead.

116.    These false or misleading statements, visual descriptions and other representations include

(a) contracting with NMGC for firm storage when Defendants knew they would often give priority to interruptible customers or entities closely related to Defendants;

(b) making false or misleading oral statements to NMGC's gas supply team in the lead-up and during Winter Storm Uri;

(c) making false or misleading written statements such as FM Notice #1, FM Notice #2 and the FM Cancellation

(d) showing KGS alongside Washington Ranch and other Kinder Morgan assets as part of the "operational response" for winter preparedness

(e) blaming "freezing temperatures" for Keystone's failures months after the storm in the April 30 letter; and

(f) promising a priority withdrawal rate of 165,000 MMBtu per day before the storm, as well as advertising KGS as "high-deliverability," when they knew they were creating operating conditions at Keystone that rendered these promises and advertising false or misleading.

117.    Defendants further knowingly made false written statements in the operating statement, the main contract document between Keystone and its customers, where the operating statement falsely asserts that Keystone is regulated by the Federal Energy Regulatory Commission. In truth, Kinder Morgan operates Keystone to take advantage of a regulatory blind spot, as a Texas intrastate storage asset exempt from FERC jurisdiction under the Hinshaw Amendment.

118.    Defendants engaged in unfair and deceptive practices specifically defined under Section 57-12-2(D)(5) of the UPA because they represented Keystone's gas storage services as having benefits that they do not have.

119.   Defendants engaged in unfair and deceptive practices specifically defined under Section 57-12-2(D)(10) of the UPA because they offered Keystone's gas storage services with an "intent not to supply reasonable expectable public demand."

120.   Defendants engaged in unfair and deceptive practices specifically defined under Section 57-12-2(D)(14) of the UPA by failing to disclose material facts to NMGC, including a failure to disclose the shift in business focus at Keystone from firm storage to PAL contracts aimed gas traders and marketers and a failure to disclose the approximately 2,000,000 MMBtu net outflow from Keystone from early December 2020 to February 12, 2021.  Defendants' failure to disclose material facts deceived or tended to deceive.

121.   Defendants engaged in unfair and deceptive practices specifically defined under Section 57-12-2(D)(15) of the UPA because Defendants stated that the firm storage contract between Keystone and NMGC "involve[ed] rights, remedies or obligations that it [did] not involve", including the priority right to withdraw gas during the storm at 165,000 MMBtu per day.

122.  Defendants engaged in an "unconscionable trade practice" as defined under Section 57-12-2(E)(1) of the UPA by taking advantage of NMGC's lack of knowledge to a grossly unfair degree, including by creating a completely asymmetric information environment where NMGC did not know that its own inventory had been or would be cut into before the storm and that the massive outflow from Keystone, beginning in early December 2020, had triggered a big drop in pressure, impairing the ability to withdraw gas from the facility.

123.   Defendants further engaged in an unconscionable trade practice as defined under Section 57-12-2(E)(2) of the UPA by frustrating NMGC's primary purpose in having a firm storage contract with Keystone, which is a reliable supply of low-cost gas in the winter.  This frustration of purpose resulted in a "gross disparity between the value received" by NMGC and

the Class and "the price paid." Recall that, under the PGAC, NMGC passes through to customers all the costs of storage fees paid to Keystone.

124.    Section 57-12-3 of the UPA makes unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce unlawful, and therefore Defendants' conduct as alleged in this Complaint is unlawful.

125.    As customers of NMGC, Plaintiffs and members of the Class suffered actual damages due to Defendants' unlawful conduct, as alleged previously and in an amount to be proven at trial. As persons who suffered a loss of money, Plaintiff and members of the Class have standing under Section 57-12-10 of the UPA to bring this private Class Action.

## COUNT III

### Tort of Economic Duress

126.    Plaintiff realleges and incorporates by reference, as if fully set forth here, allegations contained in the preceding paragraphs of this Complaint.

127.    At all times material to this Complaint, Kinder Morgan and Keystone were in a superior bargaining position to NMGC, creating a duty to offer NMGC a reasonable choice of alternatives to replacing NMGC's missing gas on the intraday and day-ahead markets, which NMGC was forced to do in the absence of reasonable alternatives. For example, NMGC was effectively without alternatives to gas storage other than Keystone facility. KGS refused to negotiate any of the terms of its operating agreement. Although KMI operated other storage fields in the area, it refused to make the storage fields available to NMGC and other firm storage customers.

128.    Defendants Kinder Morgan and Keystone breached this duty to offer a reasonable choice of alternatives, directly and proximately causing damages to Plaintiffs and the Class, as alleged previously and in an amount to be proven at trial.

129.    Defendants' conduct toward NMGC and its customers was malicious, willful, reckless, wanton, fraudulent or in bad faith and done with utter indifference to or conscious disregard for the rights and safety of NMGC's customers, entitling Plaintiffs and the Class to punitive damages.

## COUNT IV

**Intentional Interference with Prospective Economic Advantage**

130.    Plaintiff realleges and incorporates by reference, as if fully set forth here, allegations contained in the preceding paragraphs of this Complaint.

131.    Plaintiff and the Class had a reasonable economic expectancy that they would benefit from NMGC's storage contract with Keystone as part of their contractual relationship with NMGC as customers.  Although not in direct privity of contract with Keystone or Kinder Morgan, Plaintiff and members of the Class possessed this reasonable expectancy in part because the fees NMGC paid to Keystone were passed through to NMGC's customers under the PGAC, without markup or markdown.  It is manifestly reasonable to expect to get what one pays for.  Along the same lines, the costs of gas stored in Keystone is passed through to NMGC's customers under the PGAC, and thus Plaintiff and members of the Class had a reasonable economic expectancy to use the gas stored at the Keystone facility during Winter Storm Uri.

132.    KGS and KMI knew of this expectancy through a regular and historical course of dealings with NMGC in which NMGC had a pattern of purchasing advantageously priced gas and storing said gas at Keystone for withdrawal during times of peak demand and high market prices,

including winter storms such as Uri. Keystone and Kinder Morgan knew that NMGC was a public utility with customers who relied on gas during winter storms and cold spells, knew NMGC's pattern keeping storage inventory and knew the details of the daily plans of NMGC's gas supply team through regular communication and through nominations on DART. This knowledge is further shown by the repeated reassurances KMI and Keystone gave the NMGC gas supply team on February 12, February 13 and February 14, 2021.

133. Defendants intentionally interfered with this expectancy by intentionally, knowingly, and wrongfully taking, converting, loaning, or selling NMGC's gas stored at Keystone for its own benefit through more profitable transactions with interruptible and/or PAL customers and/or simply selling the gas in other markets at record-shattering prices to generate windfall profits for Defendants. Among other means, Defendants accomplished this heist with the aid of misrepresentations and lies regarding the vague and mysterious (and likely false) claims and then cancellations of force majeure, as well as the above-alleged misrepresentations regarding the rights and privileges afforded to Plaintiffs and the class through NMGC's firm storage agreement with KGS.

134. Also, Kinder Morgan's belated blaming of "freezing temperatures" for Keystone's failures during Winter Storm Uri, false or misleading explanation, not only undermines the notion of innocent explanation for the intentional interference but also evinces a consciousness of the wrongfulness of Kinder Morgan's and Keystone's conduct in the lead-up and during Winter Storm Uri.

135. Kinder Morgan and Keystone also intentionally and wrongfully breached their duty to replace NMGC's missing gas during Winter Storm Uri.

136.     Defendants' intentional and wrongful interference with the reasonable economic expectancy of Plaintiff and the Class resulted in damages, as alleged previously and in an amount to be proven at trial.

137.     Defendants' conduct toward NMGC and its customers was malicious, willful, reckless, wanton, fraudulent or in bad faith and done with utter indifference to or conscious disregard for the rights and safety of NMGC's customers, entitling Plaintiffs and the Class to punitive damages.

## COUNT V

## Unjust Enrichment

138.     Plaintiff realleges and incorporates by reference, as if fully set forth here, allegations contained in the preceding paragraphs of this Complaint.

139.     At the ultimate expense of the Class as customers of NMGC, Kinder Morgan and Keystone received the benefit of being able to abscond with and sell or loan a significant volume of natural gas into the Texas intrastate market.  Not only did this pattern of action harm the Class by forcing NMGC to purchase necessary gas at exorbitant rates, Kinder Morgan and Keystone were able to take this same gas and sell and/or loan it at the same or higher record-shattering rates creating unprecedented windfall profits at the expense of NMGC and, thereby, the Class.

140.     The benefit formed a portion of KMI's $1.092 billion increase in "earnings related to the February 2021 winter storm."[13]

141.     For Kinder Morgan and Keystone to retain this benefit would be unjust because Defendants obtained the benefit through misrepresentations, conversion, misappropriation, and other wrongful conduct as alleged, above.

---

[13] Kinder Morgan, Inc. SEC Form 10-K Annual Report as of 12/31/2021.

142.    Likewise, Kinder Morgan and Keystone obtained a benefit when they breached their duty to replace NMGC's missing gas, thus allowing Kinder Morgan to sell an equivalent volume of gas on the Texas intrastate market.  It would be unjust for Kinder Morgan to retain the higher prices received on the Texas intrastate market.

143.    Plaintiff and members of the Class have no fully adequate remedy at law because they are not in privity of contract with Keystone and Kinder Morgan (preventing them from suing for breach of contract); they did not hold legal title to the gas stored at Keystone (presenting a significant obstacle to suing for conversion, trespass or other species of theft) and, even if Plaintiff and members of the Class fully recover damages sounding in tort, Kinder Morgan would remain unjustly enriched by benefit of selling gas at the high prices it obtained in Texas.

144.    Because pipeline data and other information support the inference and conclusion that the large net outflow from Keystone starting in early December 2020 and continuing into February 2021 before Uri struck cut into NMGC's inventory in storage and because Keystone otherwise deprived NMGC of access to its storage inventory, NMGC's missing gas is comparable to an outright theft of NMGC's natural gas.  Because Kinder Morgan obtained a benefit in this way, Plaintiffs and the Class are entitled to disgorgement of all profits that Kinder Morgan derived from this unjust benefit, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiff, individually, and on behalf of the Class, respectfully requests that the Court enter judgment in his favor against Defendants, as follows:

1. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiffs' counsel as Class Counsel;

2.  That the Court award Plaintiff and the Class economic, direct, consequential, general, and special damages in an amount to be determined at trial;

3.  That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Kinder Morgan, Inc., and Keystone Gas Storage, LC, as a result of the unlawful acts, omissions, and practices described herein;

4.  That the Court award statutory damages, treble damages, and exemplary or punitive damages at the fullest extent permitted by law;

5.  That the Court award Plaintiff his costs, as well as reasonable attorneys' fees, costs, and expenses to the full extent permitted by law including the UPA;

6.  That the Court award pre- and post-judgment interest at the maximum rate allowable by law; and

7.  That the Court grant such other and further relief to which the Plaintiff and Class may be justly entitled.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims to which same is allowed under law.

**Dated February 13, 2025**

Respectfully submitted,

**ORTIZ & ZAMORA, ATTORNEYS AT LAW, LLC**

By:    */s/ Eugene (Geno) I. Zamora*
Tony F. Ortiz
Eugene (Geno) I. Zamora
Jessica R. Terrazas
530 Harkle Road, Suite B
Santa Fe, NM  87505
Tel: (505) 986-2900 / Fax: (505) 986-2911
tony@ortiz-zamora.com
geno@ortiz-zamora.com
jessica@ortiz-zamora.com

- and -

**JOHN WERTHEIM LAW, LLC**


By:      _/s/ John V. Wertheim_____
         John V. Wertheim
         317 Commercial Street, NE
         Albuquerque, NM  87102
         Tel: (505) 450-4199
         johnv@johnwertheimlaw.com


- and -

**THE GALLAGHER LAW FIRM, PLLC**


By:      _/s/ Michael T. Gallagher_____
         Michael T. Gallagher
         Pamela R. McLemore
         L. Boyd Smith, Jr.
         2905 Sackett Street
         Houston, Texas 77098
         Tel: (713) 222-8080 / Fax:  (713) 238-7852
         mike@gld-law.com
         pamm@gld-law.com
         bsmith@boydsmithlaw.com


- and -

**VELA JUSTICE, PLLC**


By:      _/s/ Rose Vela_____
         Filemon Vela – ***Pro Hac Vice pending***
         Rose Vela
         912 Prairie Street, Suite 100
         Houston, Tx  77002
         Tel: (713) 600-1800 / Fax: (713) 600-1940
         filemon@velajustice.com
         rose@velajustice.com
- and -

**BANDAS LAW FIRM. PC**

By:        */s/ Mikell A. West*
           Mikell A. West
           Robert W. Clore
           802 N. Carancahua, Ste. 1400
           Corpus Christi, TX  78401
           Tel: (361) 696-5200 / Fax: (361) 698-5222
           mwest@bandaslawfirm.com
           rclore@bandaslawfirm.com


- and -


**THE REED LAW FIRM, PLLC**


By:        */s/ Eric Reed*
           Eric Reed
           912 Prairie Street, Ste. 100
           Houston, TX  77002
           Tel: (713) 600-1800 / Fax: (713) 600-1840
           ereed@reedlawpllc.com

           ***Attorneys for Plaintiff William F. Woldman***